# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00365-COA

**WILLIAM FRANCES RYAN AND PAMELA REYNOLDS RYAN**                    APPELLANTS

**v.**

**DAVID RAY AND NANCY RAY**                    APPELLEES

DATE OF JUDGMENT:                  02/09/2017
TRIAL JUDGE:                       HON. JENNIFER T. SCHLOEGEL
COURT FROM WHICH APPEALED:         HANCOCK COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANTS:           PATRICK W. KIRBY
ATTORNEYS FOR APPELLEES:           DONALD ALAN WINDHAM
                                   MATTHEW WARD MCDADE
NATURE OF THE CASE:                CIVIL - REAL PROPERTY
DISPOSITION:                       AFFIRMED - 08/21/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE LEE, C.J., BARNES AND WESTBROOKS, JJ.**

**LEE, C.J., FOR THE COURT:**

¶1.     This appeal arises from a dispute between adjoining landowners, William and Pamela Ryan, and David and Nancy Ray, concerning an easement created in 1995—prior to their interest or ownership in the properties at issue. We must determine whether the chancellor erred when she (1) found that the deed granting the easement was ambiguous and (2) resolved the ambiguity in favor of the Rays, finding a perpetual easement for ingress and egress over the Ryans' property. We affirm these findings as set forth below.

## FACTS

¶2.     In 2011, the Ryans purchased their beachfront property in Bay St. Louis, Mississippi,

via a warranty deed from David and Mary Baria.  The warranty deed specified that the conveyance was made subject to a "reserved easement for Ingress and Egress, on, over and across the following described property," referencing a driveway alongside their property next to an adjacent rear lot owned by the Rays.  The Rays had purchased their property in 2003 via a warranty deed which conveyed rights to the easement driveway over the adjacent front lot now owned by the Ryans.  In 2005, Hurricane Katrina destroyed the Rays' residence situated on their property.  Subsequently, the Rays moved out of Mississippi but retained ownership of the lot and continued use of the driveway as needed for lawn care and other routine maintenance on the property.

¶3.     Sometime in 2013, the Rays listed their property for sale.  The Ryans, having built a home on their property since purchasing it in 2011, noticed the real estate sign on the adjacent back lot, purporting to offer for sale a portion of the Ryans' property.  The Ryans had a title examination performed on their property which revealed an easement reserved in a 1995 warranty deed through their parcel for access to the adjacent back lot owned by the Rays.  The 1995 warranty deed specifically "retain[ed] an easement for the purposes of ingress and egress on, over and across the above mentioned property to be used only for access to the chapel."  The "chapel" was a colloquial term referencing a building that had been situated on a once larger, common parcel, which encompassed both the Ryan and the Ray properties and contained numerous structures.  At all times since the 1995 warranty deed, the "chapel" building was used as a residence—not as a chapel used for religious services of any kind.  The "chapel" residence was present when the Rays purchased their

2

property in 2003 and was used as the Rays' home until it was destroyed by Hurricane Katrina.

¶4.    Both the Ray property and the Ryan property originated from a once single parcel owned by the Kingsley House and New Orleans Day Nursery, a New Orleans charity.  In 1993, Edwin and Joy Hyde acquired the property by warranty deed.  Accompanying the warranty deed to the Hydes was a survey that showed a number of structures on the property, including the "Old House," "Chapel," and multiple "Camp" and "Bath" houses.  In 1995, the Hydes separated the property, conveying a beachfront parcel (the Ryan property) to N.B. and Audrey Tournillon.  It was at this time that the Hydes created the 1995 easement "for the purposes of ingress and egress on, over and across the above-mentioned property to be used only for access to the chapel . . . ."  When the Hydes created this easement, the building referred to as the "chapel" was actually used as a residence and not as a chapel for religious services.  In fact, at no time since the 1995 warranty deed was the "chapel" ever used for any religious ceremonies, and at all relevant times it was used as a residence.

¶5.    In 1997, the Hydes further subdivided the property and conveyed the property now owned by the Rays to Curtis Johnson via warranty deed.  This deed conveyed to Johnson "an easement for ingress and egress, over and across the following described land . . . ."  The easement in the 1997 warranty deed described the same property (the Ryan property) as described in the 1995 warranty deed.  In 2003, Johnson conveyed the property to the Rays via warranty deed.  This 2003 warranty deed purported to convey a fee simple interest in the property previously described as an easement in both the 1995 and 1997 warranty deeds.

¶6.     Following the title examination which revealed the 1995 easement, the Ryans placed two physical barriers to block the driveway: one at the beginning of the Ryans' driveway (which they opened as needed only for their own use) and the other at the back of the driveway adjacent to the Rays' lot.  The Ryans then filed a complaint to remove any cloud of title, arguing that the 2003 warranty deed from Johnson to the Rays attempted to convey a driveway used to access the Rays' property and that the driveway portion of land was actually an easement which had previously terminated when the chapel was destroyed. Additionally, the Ryans sought injunctive relief to prohibit the Rays or their agents from advertising marketable title to the portion of land in question.  The Rays responded asserting a counterclaim for a declaratory judgment that a perpetual easement for ingress and egress had been created by one of the deeds, or in the alternative, that they had established an easement by prescription.

¶7.     Following a trial, the chancellor found that the 1995 warranty deed containing the express easement contained a latent ambiguity because of its use of the term "chapel."  The chancellor went on to resolve the ambiguity and further found that the easement was created with the intent to establish a perpetual easement for ingress and egress onto the Ray property. The chancellor also made an alternative finding that the Rays had established a prescriptive easement.  The Ryans now appeal.

## DISCUSSION

¶8.     The Ryans first argue the chancellor erred by finding the term "chapel" rendered the easement ambiguous.  The Ryans further argue that even if the easement was ambiguous, the

4

court erred by failing to consider parol evidence to resolve the ambiguity and further erred by altering the nature of the easement from a specific-purpose easement to a perpetual easement for ingress and egress.

¶9.    "Our standard of review of a determination of ambiguity, or the lack thereof, of a [deed], and its subsequent interpretation is two-tiered." *Crisler v. Crisler*, 963 So. 2d 1248, 1251 (¶5) (Miss. Ct. App. 2007) (citing *Tupelo Redevelopment Agency v. Abernathy*, 913 So. 2d 278, 283 (¶12) (Miss. 2005)). "Whether a [deed] is ambiguous is a question of law which we review de novo." *Id*. "If an ambiguity is found to exist, its interpretation is a matter for the trier of fact[,] which we review under a substantial evidence/manifest error standard." *Id*.

### I.    Ambiguous Easement

¶10.    "[A]n easement may be acquired by express grant, implied grant (implication), or prescription . . . ." *Favre v. Jourdan River Estates*, 148 So. 3d 361, 368 (¶20) (Miss. 2014) (internal quotation mark omitted)). "[I]n the case of an express grant, the fact of the creation of the easement, as well as its nature and extent, is determined by the language of the deed, taken in connection with the circumstances existing at the time of making it." *Id*. (internal quotation mark omitted). *Id*. "Descriptions of easements may be fairly general," but "any description . . . needs accuracy and clarity." *Id*.

¶11.    "A court interpreting a deed follows the same process as it does with contracts." *Carmody v. McGowan*, 222 So. 3d 1064, 1065 (¶2) (Miss. Ct. App. 2017) (citing *Conservatorship of Estate of Moor ex rel. Moor v. State*, 46 So. 3d 849, 852 (¶12) (Miss. Ct.

5

App. 2010)). "We begin by looking at the language of the instrument itself as contained within its 'four corners.'" *Id*. (citing *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 352 (Miss. 1990)). "If the terms of the [deed] are subject to more than one reasonable interpretation, the [deed] is considered ambiguous." *Maness v. K & A Enterprises of Miss. LLC*, No. 2017-CA-00173-SCT, 2018 WL 3791250, at *5 (¶22) (Miss. Aug. 9, 2018) (internal quotation mark omitted).

¶12. In the instant case, the deed at issue contains an easement "for the purposes of ingress and egress on, over and across the above mentioned property to be used only for access to the chapel." It is obvious in this case that the use of the term "chapel" is ambiguous or unclear. First, the term that the parties are at dispute over refers to a structure that is no longer in existence. Second, and more importantly, both parties agree that the term "chapel" does not represent its plain and ordinary meaning—neither now, nor at the time of the easement's creation. Before trial in the chancery court, the Ryans and the Rays stipulated to the fact that at the time of the 1995 warranty deed containing the easement provision, "the building referred to as the 'chapel' was actually used as a residence and not as a chapel that was conducting any type of religious services (including weddings, funerals, and any other religious ceremonies)." The parties also stipulated that "at no time since the 1995 warranty deed has the building referred to as the 'chapel' been used for any such religious ceremonies." As such, the easement's use of the term "chapel" is subject to more than one interpretation—its plain sense and its colloquial meaning understood by the parties and their predecessors in interest. Thus, it is clear that the language granting the easement presents

6

an ambiguity. Applying a de novo review, we affirm the chancellor's finding that the easement was ambiguous.

¶13. Next, we review the chancellor's interpretation of the easement under the substantial credible evidence standard. *Crisler*, 963 So. 2d at 1251 (¶5).

## II. Express Easement for Perpetual Ingress and Egress

¶14. "In ascertaining the intention of the parties from the language of the instrument, the grant or reservation should be so construed as to carry out that intention, and, in case of ambiguity or doubt, a grant or reservation of an easement ordinarily will be construed in favor of the grantee." *Jackson Motor Speedway Inc. v. Ford*, 914 So. 2d 779, 782 (¶9) (Miss. Ct. App. 2005) (quoting *Boggs v. Eaton*, 379 So. 2d 520, 522 (Miss. 1980)). "Intent is a question of fact, and is shown by the circumstances of the case, the nature and situation of the property subject to the easement, and the manner in which the easement has been used and occupied." *Calvert v. Griggs*, 992 So. 2d 627, 633 (¶15) (Miss. 2008) (internal quotation mark omitted). The supreme court has stated that "when the grant is ambiguous[,] the construction given by the parties themselves, as proved by the manner in which they exercise their rights under the conveyance, is legal evidence." *Warren v. Derivaux*, 996 So. 2d 729, 736 (¶16) (Miss. 2008) (quoting *Capital Elec. Power Ass'n v. Hinson*, 226 Miss. 450, 461, 84 So. 2d 409, 412 (1956)). "[T]he general rule is that where the grant is in general terms, the exercise of the right, with the acquiescence of both parties, in a particular course or manner, fixes the right and limits it to the particular course or manner in which it has been enjoyed." *Id*. "This rule applies not [only] to the location of the easement, but also to the

extent thereof[;] it applies to the course, manner, extent, and length." *Id*.

¶15.    The chancellor found that the evidence presented showed that "the easement was created for permanent access to the property now owned by the Rays, especially in the event the properties were further subdivided, and there was no intent to limit access only to a specific structure which was non-permanent in nature." The evidence before the chancellor included all of the deeds in the chains of title to both the Ryans and the Rays. After the initial 1995 warranty deed creating the easement, which used the language "for access only to the chapel," all the subsequent deeds—in both the Ryans' and Rays' chains of title—referenced an easement for ingress and egress without any reference to the chapel. The evidence before the chancellor also included deposition testimony from Barbara Staehle, a neighbor who lived next door to the Ryan and Ray properties for approximately seventeen years (ending in 2005) and was a real estate agent involved in many of the transactions concerning the properties. Staehle testified as to the use of the easement and colloquial use of the term "chapel" in reference to the residential home on the Ray property. Additionally, David Baria—the Ryans' immediate predecessor in interest—testified by affidavit that the Rays used the easement driveway to access their property. The 2011 deed from the Barias to the Ryans specified the property conveyance was made subject to a reserved easement for ingress and egress to the Ray property despite the fact the chapel residence was no longer in existence. All of this evidence considered on the record by the chancellor belies the Ryans' contention that the chancellor failed to use parol evidence to resolve the deed's ambiguity.

¶16.    We hold that the chancellor's finding of a perpetual easement for ingress and egress

8

onto the Ray property was supported by substantial credible evidence, particularly considering the deeds in both the Ryans' and Rays' chains of title identifying the easement as one for ingress and egress and the consistent manner the easement was used for ingress and egress to the property. This issue is without merit.

### III. Prescriptive Easement

¶17. Although the chancellor found that there was an express, perpetual easement over the Ryan property for ingress and egress to the Ray property, the chancellor made an alternative finding that in the absence of a perpetual easement, there was clear and convincing evidence to support an easement by prescription using the doctrine of tacking. The Ryans argue on appeal that the Rays failed to satisfy the elements necessary for a prescriptive easement. We agree.

¶18. In this case, there was an express easement granted, which the chancellor found was one for perpetual ingress and egress to the property at issue. We affirm that decision as it was supported by substantial credible evidence. Therefore, an alternative theory for establishing an easement is unnecessary. But moreover, the alternative ground is legally contradictory. An express easement and a prescriptive easement cannot co-exist. "The rule is well settled that use by express or implied permission or license, no matter how long continued, cannot ripen into an easement by prescription." *King v. Gale*, 166 So. 3d 589, 594 (¶22) (Miss. Ct. App. 2015). Thus, the chancellor's finding of a prescriptive easement was legally erroneous, and we do not affirm on these grounds. The error does not require reversal however, as the chancellor's disposition is affirmed on other proper grounds as set forth in

9

this opinion.

¶19.    **AFFIRMED.**

**IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.  TINDELL, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**